## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| ONE WORLD LABS, INC. | ) | Case No.  15-21110 HRT |
|     EIN: 27-1496136 | ) | |
| | ) | |
|     Debtor. | ) | |

## MOTION FOR ORDER AUTHORIZING SALE OF ASSETS
## FREE AND CLEAR OF LIENS AND INTERESTS

One World Labs, Inc. ("Debtor"), by and through counsel, Bieging Shapiro & Barber LLP, pursuant to 11 U.S.C. §§ 363(b) and (f) and 365, hereby moves the Court for entry of an Order authorizing the sale of assets free and clear of liens and interests to MNR Labs, LLC ("MNR Labs"), a Colorado limited liability company.

In support hereof, Debtor states as follows:

## INTRODUCTION

By this Motion, Debtor seeks approval of the Asset Purchase Agreement ("APA") attached hereto as Exhibit 1, which conveys certain of Debtor's assets, including but not limited to intellectual, tangible, and intangible property, assumed contracts, books, records, and third-party software, which will depreciate markedly and/or become valueless unless they can be disposed of quickly. Debtor believes it is in the best interests of its Creditors and the Bankruptcy estate to dispose of the assets contemplated by the Agreement as promptly as is reasonably possible so as to maximize the value of said assets for the benefit of the Estate.

## BACKGROUND AND PARTIES

1.      Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on or about October 2, 2015 (the "Petition Date"). Debtor remains in possession of its assets and operates as a debtor in possession. No committee has been formed.

2.      Debtor operates a security intelligence firm that provides dark web data software, cyber assessment and consulting services to protect corporations, government and non-profit organizations.

3.      Acting under the direction and supervision of its board of directors, and with the assistance of its investment banker, Debtor has made every reasonable effort to recapitalize the company, or to sell some or all of its assets through a comprehensive marketing effort, but was generally unsuccessful in those efforts. Those efforts played out over the six (6) months prior to

398810

the bankruptcy filing herein.  Those efforts did not result in any further investment in Debtor or in the sale of its assets.

4.     Debtor has entered into the attached APA with MNR Labs, subject to Court approval, which will permit Debtor to dispose of numerous assets which would otherwise depreciate markedly and/or become valueless.  In so doing, Debtor is serving the best interests of its Creditors and the Bankruptcy estate.

## THE PROPOSED SALE TO MNR LABS

**A.     The MNR Labs Agreement**

5.     A true and correct copy of the proposed APA is attached hereto as Exhibit 1.  The APA includes lists of included assets in Exhibits A through D ("Purchased Assets"), as well as excluded assets ("Excluded Assets") in Exhibit E.

6.     If the APA is approved by the Court, Debtor will sell to MNR Labs the following Purchased Assets:

     a.     <u>Intellectual Property</u>.  All intellectual property owned by Debtor and used in connection with the operation of its business, including, but not limited to, those items listed on Exhibit A;

     b.     <u>Tangible Personal Property</u>.  All tangible personal property owned by Debtor and used in connection with the operation of its business, including, but not limited to, those items listed on Exhibit B;

     c.     <u>Books, Records and Third-Party Software</u>.  For the avoidance of doubt, in addition to the general description of Tangible Personal Property, all books, records and like items pertaining to the operation of Debtor's business, including, but not limited to, all plans and specifications for the business, all other reports and business records relating to the business and the operation of the business, customer and vendor lists, data bases, advertising materials, software programs, and telephone numbers identified with the business, including but not limited to, those items listed on Exhibit C;

     d.     <u>Assumed Contracts and Contract Rights</u>.  All executory contracts and unexpired leases listed on Exhibit H and all contracts and contract rights listed on Exhibit D;

     e.     <u>Intangible Property</u>.  All intangible personal property, including, but not limited to, any trademarks, trade names, service marks, copyrights and the goodwill associated therewith, as well as those items listed on Exhibits A and D;

7.     The purchase price for the Purchased Assets is comprised of three components: (1) $50,000.00; (2) ten (10%) of MNR Labs' limited liability company membership interests ("Distributed LLC Interests") – a complete description of the Distributed LLC Interests is set

forth in Section 2.1.2 of the APA; and (3) payment of all cure amounts with respect to the Assumed Contracts, in the amounts set forth in Exhibit H.

8.     The Purchased Assets will be sold on an "as is, where is" basis, with no representations or warranties of any kind, express or implied, oral or written, with respect to the physical condition, faults or value of the Purchased Assets.  There is no warranty relating to title, possession, quiet enjoyment or the like in the disposition of the Purchased Assets.  The complete terms of the disposition in this regard are set forth in 6.2 of the APA.

9.     The property to be sold includes only the Purchased Assets. Without limiting the generality of the immediately preceding sentence, Debtor will retain the Excluded Assets listed on Exhibit E.

**B.     Treatment of Parties Against Whom Relief is Sought**

10.     The Purchased Assets will be sold free and clear of all liens, claims, encumbrances and interests, pursuant to Sections 363(b) and (f) of the Bankruptcy Code.

11.     There are no liens encumbering the Purchased Assets and all taxes are current.

12.     As previously noted, the APA contemplates that MNR Labs will purchase all Assumed Contracts, as set forth in Exhibit H of the APA, pursuant to Bankruptcy Code §§ 365 (b) and (f) and the respective cure amounts are set forth on Exhibit H.  MNR Labs will pay the cure amounts.

13.     Pursuant to F.R.B.P. 6004 and 9014, this Motion and the related notice hereof will be served upon each of the parties in the manner set forth in F.R.B.P. 7004.

14.     If any counterparty to an assumed contract believes that a different cure amount is owing, that party must file an objection to this Motion and provide the basis for the claimed cure amount.  If any such counterparty fails to file an objection, then the cure amount on Exhibit H shall be binding on such non-objecting parties.

<u>**OTHER RELIEF REQUESTED**</u>

15.     In light of the exigent circumstances, Debtor respectfully submits that the stay provided by F.R.B.P. 6004(h) should not apply to the sale proposed herein.

16.     Debtor requests that the Court find that MNR Labs is a good faith purchaser, within the meaning of 11 U.S.C. § 363(m).

WHEREFORE, Debtor, One World Lab, Inc., prays for an Order authorizing the sale of assets described in the referenced Agreement with MNR Labs, free and clear of liens and interests, and consistent with all terms and conditions contained therein, authorizing Debtor to consummate the transactions contemplated under the APA, authorizing the assumption and

assignment of the contracts on Exhibit H to the APA at the cure amounts set forth in Exhibit H, and for such other and further relief as is just and consistent with the foregoing.

DATED this 23rd day of October, 2015.

BIEGING SHAPIRO & BARBER LLP

By:____/s/ Duncan E. Barber_____
Duncan E. Barber # 16768
4582 S. Ulster St. Parkway, Suite 1650
Denver, Colorado 80237
Telephone:  720-488-5432
Telecopy:  720-488-7711

398810

4

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**" or "**APA**") is made and entered into as of this 21st day of October, 2015 (the "**Effective Date**", by and between **ONE WORLD LABS, INC.**, a Colorado corporation ("**Seller**"), and **MNR Labs, LLC**, a Colorado limited liability company ("**Buyer**").

## RECITALS

A.      Seller is debtor and debtor-in-possession in a Chapter 11 bankruptcy case pending in the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**"), Case No. 15-21110-HRT (the "**Bankruptcy Case**").

B.      Seller operates a security intelligence firm that provides dark web data software, cyber assessment and consulting services to protect corporations, government and non-profit organizations (the "**Business**").

C.      Buyer wishes to purchase certain identified assets of Seller on the terms and conditions set forth in this Agreement.  Seller wishes to accept Buyer's offer on the terms and conditions set forth in this Agreement.

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the foregoing Recitals, each of which the Parties agree is a substantive provision and integral part of their agreement, the mutual promises set forth herein, and other for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Transfer of Assets.**

    1.1      **Purchase and Sale of Assets.**  On the Closing Date, in consideration of the covenants, representations and obligations of Buyer herein, and subject to the conditions hereinafter set forth, Seller, on behalf of itself and its bankruptcy estate, shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all liens, claims and encumbrances, all of Seller's and its bankruptcy estate's right, title and interest in and to all of the assets identified in this Agreement (collectively, the "**Purchased Assets**"), including, without limitation, the following:

        1.1.1      **Intellectual Property.**  All intellectual property owned by Seller and used in connection with the operation of the Business, including, but not limited to, those items listed on **Exhibit A** (collectively, the "**Intellectual Property**");

        1.1.2      **Tangible Personal Property.**  All tangible personal property owned by Seller and used in connection with the operation of the Business, including, but not limited to, those items listed on **Exhibit B** (collectively, the "**Tangible Personal Property**").

        The Tangible Personal Property shall also expressly **exclude** any equipment or other tangible property held or employed by Seller pursuant to a lease, rental

EXHIBIT 1

agreement, contract, license or similar arrangement that does not constitute an Assumed Contract (all of which, collectively, a "**Rejected Contract**").

        1.1.3   **Books, Records and Third-Party Software**.  For the avoidance of doubt, in addition to the general description of Tangible Personal Property in Section 1.1.2, all books, records and like items pertaining to the operation of the Business, including, but not limited to, all plans and specifications for the Business, all other reports and business records relating to the Business and the operation of the Business, customer and vendor lists, data bases, advertising materials, software programs, and telephone numbers identified with the Business, including but not limited to, those items listed on **Exhibit C**.

        1.1.4   **Assumed Contracts and Contract Rights**.  All executory contracts and unexpired leases listed on **Exhibit H** and all contracts and contract rights including but not limited to, those listed on **Exhibit D** (collectively, the "**Assumed Contracts**").

        Following the date of this Agreement, Buyer may, in its sole and absolute discretion, assume additional Assumed Contracts entered into by Seller.  With respect to executory contracts, Seller agrees promptly to move for the assumption of all them included within Assumed Contracts or to assume them in Seller's plan of reorganization, with all obligations to cure any defaults under those Assumed Contracts on Exhibit H remaining the sole and exclusive responsibility of Buyer.

        1.1.5   **Intangible Property**.  All intangible personal property, including, but not limited to, any trademarks, trade names, service marks, copyrights and the goodwill associated therewith, as well as those items listed on **Exhibits A and D** (collectively, the "**Intangible Property**").

        As used in this Agreement, Intangible Property shall expressly **exclude** any software or other item of intangible property held by Seller pursuant to a Rejected Contract.

        1.1.6   **Labeling Property**.  In the event the parties have mislabeled an item of tangible property as being intangible property, or vice versa, any such labeling error is not intended to and shall not change the fact that Seller intends to sell that property to Buyer free and clear of all liens, claims and encumbrances, and Buyer intends to purchase that property in that condition.

        1.2   **Excluded Assets**.  In addition to the property expressly excluded in Section 1.1 of this Agreement, the items listed on **Exhibit E** are specifically excluded from the Purchased Assets. (collectively, the "**Excluded Assets**").

        1.3   **Instruments of Transfer**.  The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance as provided below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Purchased Assets to Buyer, but, in all events, only to the extent that these instruments do not impose any monetary obligations upon Seller (other than the expense of preparing and delivering

EXHIBIT 1

any such instruments, which Seller alone shall bear) or in any other material respect increase in any material way the burdens imposed by the other provisions of this Agreement upon Seller.

2. **Consideration.**

    2.1   **Purchase Price.** The consideration to be paid by Buyer to Seller for the Purchased Assets (the "**Purchase Price**") shall be: (a) $50,000, to be paid at Closing in good funds ("**Cash Payment**") subject to Section 2.1.1; and (b) the issuance of limited liability company membership interests of Buyer as set forth in Section 2.1.2 ("**Buyer's Distributed LLC Interests**").

    2.1.1   The Buyer's Distributed LLC Interests shall be determined, issued and distributed to Seller based on Buyer's first round of financing, which round will take place no later than within six (6) months of the Closing Date and which issuance of interests will likewise take place in that same six-month time period.

    The Buyer's Distributed LLC Interests shall be in an amount equal to ten percent (10%) of the limited liability company membership interests of Buyer, after giving effect to a projected post-Closing financing and/or offering of additional membership interests in Buyer's LLC assuming, and therefore based on, raising capital equal to and/or the offer of $1,000,000 of additional membership interests in Buyer's LLC in such offering and which capital round and/or offering Buyer completes within six (6) months of the Closing Date.

    2.2   **Assumed Liabilities.** Buyer agrees to assume only (a) the Assumed Contracts (once Seller meets all of the conditions in Section 5.2.3), and (b) those liabilities it has specifically agreed to assume in this Agreement, if any (collectively, the "**Assumed Liabilities**"). Buyer shall, effective as of the Closing Date, be assigned Seller's right, title and interest in and under the Assumed Contracts, and shall assume only the liabilities and obligations first accruing under the Assumed Contracts on and after the Closing Date. Other than the Assumed Liabilities, Buyer shall not assume or become obligated in any way to pay any liabilities, debts or obligations of Seller, including, but not limited to, any liabilities or obligations now or hereafter arising from Borrowers' Business or business activities that accrued or took place prior to the Closing or any liabilities arising out of or connected to the Bankruptcy Case.

    2.3   **Excluded Liabilities.** All liabilities, debts and obligations of Seller that Buyer has not expressly assumed are hereinafter referred to as the "**Excluded Liabilities**".

    2.4   **Allocation of Deferred Revenue and Assumed Liabilities.** Following the execution of this Agreement, if Seller is a counterparty to or enters into any agreement for the performance of any portion of services to be performed after the Closing, which agreement Buyer agrees to assume, Buyer and Seller shall mutually agree upon the allocation of the revenues, expenses and liabilities for any such agreement as between Seller and Buyer. In the event that the allocation of such revenues, expenses and liabilities would result in a positive number in favor of Buyer, Seller shall, at Closing, either deliver to Buyer the allocated amount or reduce the Cash Payment in an amount equal to such amount.

EXHIBIT 1

## 3. Bankruptcy Court Approval and Contingent Bidding Arrangements.

3.1    **Bankruptcy Court Approval.**  This Agreement is subject to, and shall not become effective until approved by, entry of a written order of the Bankruptcy Court in Seller's bankruptcy case.

3.2    **Sale Motion.**  Promptly after the Effective Date, Seller shall file a motion (the "**Sale Motion**") with the Bankruptcy Court seeking approval of this Agreement and sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances authorized pursuant to 11 U.S.C. § 363(b)(the "**Sale Order**").  Buyer shall use commercially reasonable efforts to cooperate with and assist Seller in its efforts to obtain the approval and entry of the Sale Order.

3.3    **Auction Contingency.**   This Agreement does not contemplate the necessity of conducting further marketing of Seller's assets and/or some manner of auction sale because of the extensive, albeit unsuccessful, marketing efforts Seller made prepetition.  If the Bankruptcy Court disagrees, or an interested party disagrees and the Bankruptcy Court agrees with that interested party, Seller and Buyer wish to ensure that they have prepared for that contingency and that any such events will not unreasonably delay the sale of the Seller's assets to the detriment of the estate and its creditors.  Accordingly, should the contingencies to which this Section 3.3 refers arise, the Sale Motion shall include, solely in the alternative and subject to the Bankruptcy Court's determination of some need for these processes, a request to approve bidding procedures for the sale of the Property ("**Bid Procedures Order**").  In the event the Bankruptcy Court requires an auction, Buyer shall use commercially reasonable efforts to cooperate with and assist Seller in its efforts to obtain the approval and entry of the Bid Procedures Order.

3.4    **Bidding Procedures.**  The bidding procedures to be employed in the alternative shall provide, among other things, that:

3.4.1   In the event the Bankruptcy Court determines that an interested party or parties should be allowed to bid for the Purchased Assets at an auction, each such bidder must be able to demonstrate, at a minimum, the financial ability to close on the transactions contemplated by this Agreement and perform all the obligations hereunder.  At a minimum, the required information shall include current financial statements and a letter from that party's bank or financial institution confirming such party's financial strength and ability to close on the transactions.

3.4.2   Any initial minimum overbid shall be not less than **$50,000.00** in excess of Seller's Cash Payment (the "**Initial Overbid**") with additional overbids in minimum increments of **$25,000.00** (the "**Overbid**").

3.4.3   With the Initial Overbid and any subsequent Overbid, the bidder shall submit a Bid Form in which it sets forth the changes it proposes to make to this Agreement to make it the agreement pursuant to which it:  (a) is submitting its Overbid; (b) is proposing to become the substitute buyer; and (c) agrees it shall promptly execute if selected as the highest and best bid.  Seller shall consider any such proposed changes in its

EXHIBIT 1

determination of the value of the bid and whether a bid is eligible to the selected as the highest and best bid.

      3.4.4   In the event a party is allowed to submit an Initial Overbid, it and each subsequent Overbid shall be in writing on an executed Bid Form. The Buyer shall be allowed to submit Overbids.

      3.4.5   Each written Overbid submitted to Seller at the auction (including the Initial Overbid) shall be immediately read aloud to all bidders.  The Overbids shall be taken in the order submitted to Seller.  Seller shall review all Overbids and shall determine if the bid meets the minimum requirements for an Overbid and is the highest and best bid.

      3.4.6   Each round of bidding shall begin with the bidder submitting the Initial Overbid.  Any and each subsequent round of bidding will have the bidding order follow the order in which the Overbids were first submitted.  Bidding shall continue until fifteen (15) minutes, as announced and timed by Seller, has elapsed without a new Overbid being made by the bidders as they are approached in order of right to bid.

      3.4.7   In the event one or more subsequent qualifying Overbids are made, the last highest and best such subsequent qualifying Overbid, as determined by Seller in its reasonable discretion, shall be deemed the successful bid (the "**Successful Bidder**") and Seller shall sign the Bid Form of the Successful Bidder and the Successful Bidder shall be deemed the "Buyer" of the Purchased Assets as otherwise set forth in this Agreement as modified by the Bid Form to which Seller has agreed; provided, however, for the purposes of Section 3.5, "Buyer" shall continue to mean MNR Labs, LLC and shall not in any way refer to the Successful Bidder.

    3.5    **Break-Up Fee and Expense Reimbursement.**

      3.5.1   In the event that the Successful Bidder is a person other than Buyer or if the Purchased Assets are acquired in a transaction not contemplated by this Agreement through no fault of Buyer, at a closing or consummation of such transaction, Seller shall pay to Buyer a break-up fee in the amount of two and one-half percent (2.5%) of the Purchase Price (the "**Break-Up Fee**") for proceeding with this Agreement plus an expense reimbursement, consisting of Buyer's actual out-of-pocket fees and expenses, not to exceed $30,000.00, inclusive of reasonable attorneys' fees (the "**Expense Reimbursement**").

      3.5.2   In the event the Purchased Assets are sold pursuant to an Overbid not submitted by Buyer, the Seller shall pay to Buyer the Expense Reimbursement and the Break-up Fee upon sale of the Purchased Assets, which obligation shall be an expense of administration entitled to a first priority under § 503 of the Bankruptcy Code and which shall be a first priority lien on the Purchased Assets pursuant to § 364 of the Bankruptcy Code. Additionally, the Expense Reimbursement shall be paid, as an expense of administration entitled to a first priority under § 503 of the Bankruptcy Code, in the event that the Sale Motion is approved by the Bankruptcy Court and then is rescinded by the Bankruptcy Court, the Sale Order is reversed on appeal or should the case be converted to Chapter 7.

                               EXHIBIT 1

## 4. **Closing Transactions.**

    4.1    **Closing.**    The Closing of the transactions provided for herein (the "**Closing**") shall take place at the offices of Seller's counsel, located in Denver, Colorado.

    4.2    **Closing Date.**    The Closing shall be held no later than eleven (11) days after the earlier of: (a) the entry of the Sale Order; or (b) the Confirmation Order confirming Seller's proposed plan of reorganization, as the case may be and in either event consistent with the provisions of Section 5.2.5; provided, however, in no event shall the Closing be held later than December 15, 2015 (the "**Outside Date**"). In the event the conditions to Closing have not been satisfied or waived in writing by the Outside Date, then Buyer, if it is not in default hereunder, may terminate this Agreement. Until this Agreement is terminated, the parties shall diligently continue to work to satisfy all conditions to Closing and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived. The date that the Closing actually takes place shall be referred to herein as the "**Closing Date**."

    4.3    **Seller's Deliveries to Buyer at Closing.**    On the Closing Date, Seller shall make the following deliveries to Buyer:

    4.3.1    A bill of sale, duly executed by Seller, in the form and on the terms of the bill of sale attached hereto as **Exhibit F,** pursuant to which Seller transfers the Tangible Personal Property to Buyer.

    4.3.2    An assignment of Intellectual Property and intangible property, duly executed by Seller, in the form and content of the assignment of Intellectual Property and intangible property attached as **Exhibit G** hereto, pursuant to which Seller assigns to Buyer its interest in and to the Intellectual Property and intangible property.

    4.3.3    Any such other documents or other things reasonably contemplated by, or reasonably necessary to fulfill the purposes and intent of, this Agreement to be delivered by Seller to Buyer at the Closing.

    4.3.4    The foregoing documents are collectively referred to herein as the "**Closing Documents**".

    4.4    **Buyer's Deliveries to Seller at Closing.**    On the Closing Date, Buyer shall make or cause the following deliveries to Seller:

    4.4.1    The Cash Payment to be delivered in good funds by Buyer directly to Seller or as otherwise directed by the Bankruptcy Court in the Sale Order or Confirmation Order, as the case may be, at the Closing.

    4.4.2    A counterpart to each of the Closing Documents duly executed by Buyer, as required.

    4.4.3    Any such other documents or other things reasonably contemplated by, or reasonably necessary to fulfill the purposes and intent of, this Agreement to be delivered by Buyer to Seller at the Closing.

EXHIBIT 1

4.5 **Sales, Use and Other Taxes; Bankruptcy Code § 1146.** Any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, which may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer; provided, however, that, in connection with the approval and authorizations of the transactions contemplated in and by this Agreement, Bankruptcy Code § 1146 shall apply to these transactions.

4.6 **Possession and Use of Purchased Assets.** All rights to possession and use of the Purchased Assets shall transfer to Buyer on the Closing Date. Seller shall transfer and deliver to Buyer on the Closing Date such passwords, keys, locks and safe combinations and other similar items as Buyer may reasonably require to use, occupy, own and control the Purchased Assets, and shall also make available to Buyer at its then existing locations the originals of all documents in Seller's possession that are required to be transferred to Buyer by this Agreement.

5. **Conditions Precedent to Closing.**

5.1 **Conditions to Seller's Obligations.** Seller's obligation to make the deliveries required of Seller at the Closing Date shall be subject to the satisfaction of or written waiver by Seller of each of the following conditions.

5.1.1 All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

5.1.2 Buyer shall have delivered, or shall be prepared to deliver at the Closing, all cash and other documents required of Buyer to be delivered at the Closing, including without limitation the Cash Payment in good funds.

5.1.3 Buyer shall have delivered to Seller appropriate evidence of all necessary corporate or similar action by Buyer in connection with the transactions contemplated hereby, including, without limitation, certified copies of resolutions duly adopted by Buyer's manager(s) or member(s), as the case may be, approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement.

5.1.4 The Bankruptcy Court shall have entered the Sale Order or the Confirmation Order, as the case may be, and such Order shall not have been stayed as of the Closing Date.

5.2 **Conditions to Buyer's Obligations.** Buyer's obligation to make the deliveries required of Buyer at the Closing shall be subject to the satisfaction of or written waiver by Buyer of each of the following conditions:

5.2.1 All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects.

EXHIBIT 1

5.2.2   Seller shall have executed and be prepared to deliver to Buyer the Closing Documents.

5.2.3   Seller shall have delivered, or shall be prepared to deliver at the Closing, all other documents required of Seller to be delivered at the Closing.

5.2.4   Seller shall have cured any and all default existing under the Assumed Contracts, and shall have obtained a Bankruptcy Court Order approving Seller's cure, assumption and assignment to Buyer of the Assumed Contracts.

5.2.5   The Bankruptcy Court shall have entered the Sale Order or the Confirmation Order, as the case may be, and such Order shall be a final and non-appealable order as of the Closing Date.

5.3   **Conditions to Buyer's and Seller's Obligations.**   Notwithstanding any other provision of this Agreement, neither Seller nor Buyer shall have any obligation to consummate the Closing of the transactions contemplated hereby unless the Bankruptcy Court enters a final, non-appealable order that, among other things:  (a) approves the sale of the Purchased Assets in accordance with the terms and conditions of this Agreement; (b) confirms that the sale of the Purchased Assets is free and clear of any interest, lien, claim or encumbrance of any kind; (c) authorizes and requires Seller to sell the Purchased Assets pursuant to 11 U.S.C. § 363(b) under the terms of this Agreement free and clear of all liens, claims and encumbrances, whether arising prepetition or post-petition; (d) finds that Buyer is a good faith purchaser pursuant to 11 U.S.C. § 363(m); (e) finds that Buyer did not engage in any conduct (whether acts or omissions) that would cause or permit this Agreement or the consummation of this transaction to be avoided, or costs or damages to be imposed, under 11 U.S.C. § 363(n); and (f) such other terms and conditions upon which Seller and Buyer mutually agree.

6.   **Seller's Representations and Warranties.**   Seller hereby makes the following representations and warranties to Buyer:

6.1   **Title to Purchased Assets.**   Except as is expressly set forth elsewhere in this Agreement, Seller has and on the Closing Date will have complete and unrestricted power and the unqualified right to sell, assign, transfer, convey and deliver to Buyer, and will transfer and convey to Buyer at the Closing and Buyer will acquire at the Closing, all of Seller's rights, title and interests in and to the Purchased Assets free and clear of any lease, lien, security interest, claim, charge or encumbrance whatsoever

6.2   **As Is/Where Is Sale.**   Except as is expressly set forth elsewhere in this Agreement, and without negating the conveyance free and clear of all liens, claims and encumbrances, the Purchased Assets are being sold "AS IS" and "WHERE IS" with no representations or warranties of any kind, express or implied, oral or written, with respect to the physical condition, faults or value of the Purchased Assets. There is no warranty relating to title, possession, quiet enjoyment or the like in this disposition. Seller hereby expressly disclaims any and all warranties, express or implied, relating to the Purchased Assets, including without limitation, the warranty of merchantability and fitness for a particular purpose or any other fact or matter not expressly set forth herein.  Upon the Closing, Buyer shall assume all responsibility,

EXHIBIT 1

shipping costs, storage costs, liability and obligation for the physical condition and status of the Purchased Assets.   Seller makes no express or implied warranties, representations or endorsements whatsoever, including, without limitation, warranties of merchantability, non-infringement or fitness for a particular purpose with regard to the Purchased Assets, and Seller hereby expressly disclaims any such warranties to the maximum extent permitted by applicable law.  Seller makes no representation or warranty and shall have no liability whatsoever on behalf of Seller or any third parties with regard to the operation, performance, nonperformance, quality, availability, completeness, accuracy or security any of the Purchased Assets.

6.3   **Organization.**  Seller:   (a) is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation; (b) has all requisite corporate power and authority to execute, deliver, and perform the transactions contemplated hereby; and (c) is duly qualified or authorized to conduct business and is in good standing as a foreign corporation in such jurisdictions where failure to be so qualified or authorized could reasonably be expected to have a Material Adverse Effect on Seller.  For purposes of the Agreement, a "**Material Adverse Effect**" shall mean a material adverse effect on the enforceability of this Agreement or Seller's ability to transfer the Purchased Assets free and clear of all liens, claims and encumbrances.

6.4   **Authority.**  The execution, delivery, and performance by Seller of this Agreement and the consummation of the transaction contemplated hereby are within the power of Seller and have been duly authorized by all necessary actions on the part of Seller.  The execution of this Agreement by Seller constitutes, or will constitute, a legal valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except only as may be limited by the Sale Order or Confirmation Order, as the case may be.

6.5   **Consent.**  No consent, approval authorization or order of, or registration or filing with, or notice to, any court or governmental agency or body having jurisdiction or regulatory authority over Seller (or any of its properties), other than that of the Bankruptcy Court, is required for (a) Seller's execution and delivery of this Agreement (and each agreement executed and delivered by it in connection herewith) or (b) the consummation by Seller of the transactions contemplated by this Agreement (and each agreement executed and delivered by it in connection herewith) or, to the extent so required, such consent, approval, authorization, order, registration, filing or notice has been obtained, made or given (as applicable) and is still in full force and effect on the Closing Date.

7. **Buyer's Warranties and Representations.**  Buyer hereby makes the following representations and warranties to Seller:

7.1   **Validity of Agreement.**  All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not limited to, the performance of Buyer's obligations hereunder, has been taken.   This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms.

7.2   **Organization, Standing and Power.**  Buyer is a Colorado limited liability company, duly organized, validly existing and in good standing under the laws of the

EXHIBIT 1

State of Colorado.  Buyer has all requisite company power and authority to own, lease and operate its properties, to carry on its business as now being conducted, and to execute, deliver and perform this Agreement.

7.3 **Authorization.**  The execution, delivery and performance of this Agreement by Buyer have been duly and validly authorized.  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (a) conflict with or result in a breach of the articles of organization or operating agreement of Buyer; (b) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority to which Buyer is subject; or (c) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or its assets or properties may be bound.

8. **Pre-Closing Activities.**

8.1 **Operation of Seller's Business Pending Closing.**  Unless Buyer otherwise consents in advance in writing, during the period prior to the Closing Date, Seller shall operate the Business in a professional and commercially reasonable manner and, consistent with such operation, shall preserve intact its current business organization and its current relationships with employees and persons having dealings with it.

Without limiting the generality of the immediately preceding sentence, during the period from the date of this Agreement to the Closing Date, without Buyer's prior written consent, Seller shall:

8.1.1  Not offer, or enter into any contract or arrangement whether for purchase, lease, sale or otherwise, other than in the ordinary course of business;

8.1.2  Not offer to agree, agree to sell, lease or dispose of or sell, lease or dispose of or agree to purchase any real, personal or intangible property, or equipment, other than in the ordinary course of business;

8.1.3  Not enter into or amend or agree to amend any lease involving real, personal or intangible property, or equipment, other than in the ordinary course of business;

8.1.4  Not enter into, or amend or agree to amend, any borrowing or credit facility that would involve any manner of lien or lead to any manner of claim against the Purchased Assets, except for a borrowing, credit facility or series of borrowings or facilities that Buyer provides Seller; and

8.1.5  Maintain and keep all of the Purchased Assets in good standing and in good repair.

8.2 **Access to Records and Properties of Seller Prior to Closing.**  Subject to any confidentiality agreements entered into between Buyer and Seller, from and after the date of this Agreement until the Closing Date, Seller shall afford to Buyer's managers, members,

EXHIBIT 1

officers, independent public accountants, attorneys, lenders, consultants and other representatives, reasonable access to examine (and, where necessary or appropriate, to copy) at all reasonable times to the Purchased Assets and all Seller's records pertaining to the Business and/or the Purchased Assets. Buyer, however, shall not be entitled to access to any materials containing Seller's attorney-client privileged communications or information about employees, disclosure of which might violate HIPPA or an employee's reasonable expectation of privacy. Buyer expressly acknowledges that nothing in this Section 8.2 is intended to give rise to any condition precedent to Buyer's obligations to proceed with the transactions contemplated herein.

        8.3   **Employees.** Buyer intends to consider whether to offer employment to some or all of the remaining employees Seller employs or employed at the Business, at terms and conditions satisfactory to Buyer in its sole and unfettered discretion. Seller acknowledges and agrees that: (a) Buyer is authorized to speak to those employees and to offer them prospective employment, and to do so before the Closing; (b) Buyer shall have no obligation to offer to employ or to employ any of the employees of Seller employed in the conduct of the Business; and (c) Buyer shall assume no liability for any past or past due wage or other obligations of Seller existing or incurred in the period prior to the Closing.

### 9.  **Termination and Default.**

        9.1   **Methods of Termination.** This Agreement may be terminated in any of the following ways:

        9.1.1   At any time on or before the Closing by the mutual consent in writing of Seller and Buyer;

        9.1.2   By Buyer if Closing is not completed by December 31, 2015;

        9.1.3   By Buyer if any condition set forth in Section 4.3 of this Agreement shall not have been met as of the date specified for Closing other than through the failure of Buyer to comply with its obligations under this Agreement, or waived in writing by Buyer (to the extent a condition may be waived);

        9.1.4   By Seller if any condition set forth in Section 4.4 of this Agreement shall not have been met as of the date specified for Closing other than through the failure of Seller to comply with its obligations under this Agreement, or waived in writing by Seller (to the extent a condition may be waived);

        9.1.5   By Buyer at any time on or before the Closing Date if Seller is in breach of any representation or warranty in any material respect (as if such representation or warranty had been made on and as of the date hereof and on the date of the written notice of breach referred to below, and without regard to any materiality qualifier contained therein except for that for which Section 6.3 provides), or has committed a material breach of any covenant, undertaking or obligation contained herein, and such alleged breach has not been cured by the earlier of five (5) business days after the giving of notice to the breaching party or on or before the Closing Date; and

EXHIBIT 1

9.1.6    By Seller at any time on or before the Closing Date if Buyer is in breach of any representation or warranty in any material respect (as if such representation or warranty had been made on and as of the date hereof and on the date of the written notice of breach referred to below, and without regard to any materiality qualifier contained therein), or has committed a material breach of any covenant, undertaking or obligation contained herein, and such alleged breach has not been cured by the earlier of five (5) business days after the giving of notice to the breaching party or on or before the Closing Date.

9.2    **Effect of Termination.**

9.2.1    In the event of termination of this Agreement and the abandonment of the proposed transactions by either breach by any party hereto, the inability to obtain Bankruptcy Court approval in either a Sale Order or Confirmation Order, as the case may be, the conversion of the case to Chapter 7, this Agreement shall become void and have no effect, without any liability on the part of any party or the managers, directors, officers, shareholders, or members of any party, except that Sections 3.5 and 10.23 shall survive the termination of the Agreement.

9.2.2    In the event of termination of this Agreement and the abandonment of the proposed transactions due to a breach of this Agreement by Buyer, this Agreement shall become void and have no effect, without any liability on the part of Seller or its directors, officers or shareholders, except that Sections 10.1 and 10.20 shall survive the termination of the Agreement.

9.2.3    In the event of termination of this Agreement and the abandonment of the proposed transactions due to a breach of this Agreement by Seller, this Agreement shall become void and have no effect, without any liability on the part of the Buyer or its managers, officers or members, except that Sections 3.5, 10.1 and 10.20 shall survive the termination of the Agreement.

10. **Miscellaneous.**

10.1    **Attorneys' Fees.**  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.2    **Notices.**  Unless otherwise provided herein, all notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given, made and received only when transmitted if: (a) transmitted by telecopy, upon printed confirmation of complete transmission by facsimile; (b) delivered (personally, by courier service such as Federal Express, or by other messenger) or (c) when deposited in the United States mails, registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below, with confirming copies of notices under (a), (b)

EXHIBIT 1

or (c) to be provided by email.  Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

|  |  |
|---|---|
| If to Seller: | One World Labs, Inc.<br>2505 West 2nd Ave.<br>Denver, Colorado 80219<br>Attention: Thomas Kim, Chief Restructuring Officer<br>Fax: 303-942-7385<br>E-mail:tkim@r2llc.com |
| With a copy to: | Duncan E. Barber<br>Bieging Shapiro & Barber LLP<br>4852 S. Ulster Street Parkway, Suite 1650<br>Denver, Colorado 80237<br>Telephone:  720/488-5432<br>Fax:  720-488-7711<br>E-mail:  dbarber@bsblawyers.com |
| To Buyer: | MNR Labs, LLC<br>180 Humboldt St.<br>Denver, Colorado 80218<br>Ph: 303-378-2475<br>Email: rcohen@ph2labs.com and markturnage@me.com |
| With a copy to: | Andrew J. Petrie<br>Ballard Spahr LLP<br>1225 17th Street, Suite 2300<br>Denver, Colorado 80202<br>Direct: 303.299.7339<br>Fax: 303.296.3956<br>PetrieA@ballardspahr.com |

10.3   **Entire Agreement.**  This Agreement and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Purchased Assets, and there are no other or further agreements.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect.

10.4   **Modification.**   This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto.

10.5   **Timing of Closing Transactions.**  All actions to be taken before or on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

EXHIBIT 1

10.6   **Severability**.  Should any term, provision or paragraph of this Agreement be determined to be illegal, void, or of no force and effect, the balance of the Agreement shall survive except that, if Buyer cannot acquire and Seller cannot sell substantially all of the Purchased Assets, either party may terminate this Agreement, and it shall be of no further force and effect, unless both parties agree in writing to the contrary.

10.7   **Captions.**  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.8   **Further Assurances and Cooperation.**  Each party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the parties with respect thereto.

10.9   **Waiver.**  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

10.10   **Brokerage Obligations.**  Seller and Buyer each represent and warrant to the other that such party has incurred no liability to any broker or agent with respect to the payment of any fee or commission regarding the consummation of the transaction contemplated hereby.

10.11   **Survival.**  The respective representations, warranties, covenants and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.  The representations, warranties, indemnities, covenants and agreements of each of the parties hereto shall survive the Closing Date.

10.12   **Assignments.**  This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto, which consent the other party shall not unreasonably delay or withhold.  Neither party may delegate or subcontract for the performance of all or any of its obligations or duties hereunder, without the prior written consent of the other party.

10.13   **Binding Effect.**  This Agreement shall bind and inure to the benefit of the parties and their respective successors, and permitted assigns.

10.14   **Applicable Law.**  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of Colorado (without reference to conflicts of law principles).

10.15   **Good Faith.**  Both Seller and Buyer agree to do all acts and execute all documents required to carry out the terms of this Agreement, and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

EXHIBIT 1

10.16 **Waiver of Trial by Jury.**   SELLER AND BUYER HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT, OR IN ANY WAY CONNECTED WITH, OR RELATED TO, OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. SELLER AND BUYER HEREBY AGREE THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY OR PARTIES HERETO TO WAIVER OF ITS OR THEIR RIGHT TO TRIAL BY JURY.

10.17 **Submission to Jurisdiction; Selection of Forum.**   EACH PARTY HERETO:  (a) AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT, CONTRACT OR OTHERWISE, WHETHER AT LAW OR IN EQUITY, EXCLUSIVELY IN (i) THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO; OR, IN THE EVENT THAT SUCH COURT LACKS SUBJECT MATTER JURISDICTION OVER THE ACTION OR PROCEEDING, (ii) IN AN APPROPRIATE STATE COURT LOCATED  IN THE CITY AND COUNTY OF DENVER, COLORADO (SUCH COURT HEREAFTER REFERRED TO AS THE "CHOSEN COURT"), (b) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE CHOSEN COURT, (c) WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE CHOSEN COURT, (d) WAIVES ANY ARGUMENT THAT THE CHOSEN COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY THERETO, AND (e) AGREES THAT SERVICE OR PROCESS UPON ANY PARTY IN ANY SUCH ACTION OR PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH SECTION 10.3 OF THIS AGREEMENT.

10.18 **Construction.**   The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local statute, law or ordinance shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including without limitation" or "including, but not limited to".

10.19 **No Third-Party Beneficiaries.**  This Agreement shall not confer any rights or remedies upon any person or entity other than the parties hereto and their respective successors and permitted assigns.

10.20 **Fees and Expenses.** Except as set forth in Sections 3.5 and 10.1, Seller and Buyer shall each bear their own expenses, including but not limited to attorneys' fees and costs, incurred in connection with or arising out of the negotiation and preparation of this Agreement and the consummation of the transactions contemplated hereby.

10.21 **Confidentiality.** Buyer and Seller agree that they will hold in confidence all information, data and documents obtained by them or any of their representatives from any representative, officer or employee of each other.

10.22 **Counterparts.** This Agreement may be signed in counterparts. The parties further agree that this Agreement may be executed by the exchange of facsimile signature pages provided that by doing so the parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

10.23 **Time is of the Essence.** Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

*[Remainder of this page left deliberately blank.]*

EXHIBIT 1

**IN WITNESS WHEREOF** Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

"Buyer"

MNR Labs, LLC, a Colorado limited liability company

By: _Russell Cohen_
Name: Russell Cohen
Its: Manager

"Seller"

ONE WORLD LABS, INC., a Colorado corporation

By: _Thomas Kim_
Name: Thomas Kim
Its: Chief Restructuring Officer

BSSB#398670

17

EXHIBIT 1

**List of Exhibits**

Exhibit A    -    List of Intellectual Property

Exhibit B    -    List of Tangible Personal Property

Exhibit C    -    List of Intangible Property

Exhibit D    -    List of Books, Records and Third-Party Software

Exhibit E    -    List of Excluded Assets

Exhibit F    -    Bill of Sale

Exhibit G    -    Assignment of Intangible Property

Exhibit H    -    Assumed Contracts and Cure Amounts

EXHIBIT 1

## EXHIBIT A

## LIST OF INTELLECTUAL PROPERTY

| Category | Name | Description |
|---|---|---|
| Marketing | OWL Logo | Logo file |
| Marketing | OneWorldLabs.com | Website, URL and all content Customer facing web application |
| Product | OWL Vision Professional Tools (vision.oneworldlabs.com) | |
| Product | Analyst UI (previously known as "OWL DeepNet Hunter") | Internal use only/POC web application |
| Product | OWL Vision Feeds | Future product line - Data feed, threat feed |
| Product | OWL Vision API | Future product - API |
| Design | OWL_APPLICATION_VISUAL_FRAMEWORK_V007 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Alerts_Onboard_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Alerts_Search_Details_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Save_Search_Alternate_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_System_Messages_V001 | Visual Design Comps |
| Design | OWL_Customer_eCommerce_V001 | Visual Design Comps |
| Design | OWL_Customer_Emails_Visual_Design_V001 | Visual Design Comps |
| Design | OWL_Customer_Help_&_General_Pages_V001 | Visual Design Comps |
| Design | OWL_Customer_Login_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_New_Search_Pods_V003 | Visual Design Comps |
| Design | OWL_Customer_Search_Results_&_404_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_Results_Options_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_Results_Pagination_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_V003 | Visual Design Comps |
| Design | OWL_Customer_User_Management_V001 | Visual Design Comps |
| Design | Login-Background v01 | Visual Design Comps |
| Design | OWL Analyst Dashboard Release 3 Alerts Results v01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V02 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V03 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V04 | Visual Design Comps |

| | | |
|---|---|---|
| Design | OWL_Analyst_Dashboard_Visual_Design_V05 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V06 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V07_SPECCED | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Save_Search_Alternate_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Search_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Search_V002 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Alerts_Results_V02 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Alerts_Results_V03 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Reports_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Templates_Profiles_Monitors_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Templates_Profiles_Monitors_V02 | Visual Design Comps |
| Design | OWL_Client_Portal_Visual_Design_V01 | Visual Design Comps |
| Design | OWL_Client_Portal_Visual_Design_V01B_MVP | Visual Design Comps |
| Design | OWL_FFTOR_Plugin_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Notifications_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_OnDemandJobProgress_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_New_Search | Visual Design Comps |
| Design | OWL_APPLICATION_VISUAL_FRAMEWORK_V007 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Alerts_Onboard_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Alerts_Search_Details_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_Save_Search_Alternate_V001 | Visual Design Comps |
| Design | OWL_Customer_Dashboard_System_Messages_V001 | Visual Design Comps |
| Design | OWL_Customer_eCommerce_V001 | Visual Design Comps |
| Design | OWL_Customer_Emails_Visual_Design_V001 | Visual Design Comps |
| Design | OWL_Customer_Help_&_General_Pages_V001 | Visual Design Comps |
| Design | OWL_Customer_Login_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_New_Search_Pods_V003 | Visual Design Comps |

| Design | OWL_Customer_Search_Results_&_404_V001 | Visual Design Comps |
|---|---|---|
| Design | OWL_Customer_Search_Results_Options_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_Results_Pagination_V001 | Visual Design Comps |
| Design | OWL_Customer_Search_V003 | Visual Design Comps |
| Design | OWL_Customer_User_Management_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V02 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V03 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V04 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V05 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_V06 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Alerts_Results_V03 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Reports_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Templates_Profiles_Monitors_V01 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_RELEASE_3_Templates_Profiles_Monitors_V02 | Visual Design Comps |
| Design | OWL_Client_Portal_Visual_Design_V01 | Visual Design Comps |
| Design | OWL_Client_Portal_Visual_Design_V01B_MVP | Visual Design Comps |
| Design | OWL_FFTOR_Plugin_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_OnDemandJobProgress_V001 | Visual Design Comps |
| Design | OWL_Analyst_Dashboard_Visual_Design_New_Search | Visual Design Comps |
| Design | OWL_IRC_Results_V001 | Visual Design Comps |
| Design | OWL_Customer_Flow_User_Signup_V001 | Wireframes |
| Design | OWL_Customer_Flow_User_Validation_V001 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V001 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V002 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V003 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V004 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V005 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V005B | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V006 | Wireframes |
| Design | OWL_Firefox_Plugin_WF_V001 | Wireframes |
| Design | OWL_APPLICATION_UX_FRAMEWORK_WF_V001 | Wireframes |

| | | |
|---|---|---|
| Design | OWL_Customer_Dashboard_Alert_Onboarding_WF_V001 | Wireframes |
| Design | OWL_Customer_eCommerce_WF_V004 | Wireframes |
| Design | OWL_Customer_Flow_User_Signup_V001 | Wireframes |
| Design | OWL_Customer_Flow_User_Validation_V001 | Wireframes |
| Design | OWL_Customer_Search_WF_V007A | Wireframes |
| Design | OWL_Customer_Search_WF_V007B | Wireframes |
| Design | OWL_Customer_User_Management_WF_V003 | Wireframes |
| Design | OWL_Dashboard_WF_V001 | Wireframes |
| Design | OWL_Dashboard_WF_V002 | Wireframes |
| Design | OWL_Dashboard_WF_V003 | Wireframes |
| Design | OWL_Dashboard_WF_V004 | Wireframes |
| Design | OWL_Dashboard_WF_V005 | Wireframes |
| Design | OWL_Dashboard_Templates_WF_V006 | Wireframes |
| Design | OWL_Firefox_Plugin_WF_V001 | Wireframes |
| Design | OWL_Result_Numbers_WF_V001 | Wireframes |
| Design | OWL_Activities_WF_V001 | Wireframes |
| Design | OWL_Job_Progress_WF_V001 | Wireframes |
| Design | OWL_NewSearchFields_WF_V001 | Wireframes |
| Design | OWL_Notifications_WF_V001 | Wireframes |
| Design | OWL_Activities_Workflow_V001 | UX Documentation |
| Design | OWL_Client_Portal_Visual_Design_V01-1049 | UX Documentation |
| Design | OWL_ClientPortal_Personas_FuncMap_Flows_V001 | UX Documentation |
| Design | OWL_ClientPortal_Personas_FuncMap_Flows_V001 | UX Documentation |
| Design | OWL Portal Research Preso | UX Documentation |
| Design | Client_Profile_Workflow | UX Documentation |
| Design | IRC Meeting Findings | UX Documentation |
| Documentation | 0_0 Cover Page | Developer Documentation |
| Documentation | 0_1 OWL Vision Platform and Product Overview | Developer Documentation |
| Documentation | 0_2 Overview of Big Data Storage, MR, and Analytics | Developer Documentation |
| Documentation | 0_3 Architecture Diagram | Developer Documentation |
| Documentation | 0_4 Data Flow and Interface Summary | Developer Documentation |
| Documentation | 1_0 Job Manager_Poseidon | Developer Documentation |

22

| Documentation | 2_0 Crawler_Kraken | Developer Documentation |
|---|---|---|
| Documentation | 2_0_1 Firefox Plugin | Developer Documentation |
| Documentation | 3_0 Cerberus (Deprecated) | Developer Documentation |
| Documentation | 4_0 Kafka_Storm | Developer Documentation |
| Documentation | 4_0_1 Kafka-Storm Diagram | Developer Documentation |
| Documentation | 5_0 Whois Service | Developer Documentation |
| Documentation | 6_0 MasterLinks | Developer Documentation |
| Documentation | 7_0 Job Tables | Developer Documentation |
| Documentation | 8_0 Scheduler | Developer Documentation |
| Documentation | 9_0 Index_Elasticsearch | Developer Documentation |
| Documentation | 10_0 QueryServices | Developer Documentation |
| Documentation | 11_0 Customer UI | Developer Documentation |
| Documentation | 12_0 OWL Vision Professional Tools | Developer Documentation |
| Documentation | 12_0_1 In-App Help Documentation | Developer Documentation |
| Documentation | 13_0 Admin Portal | Developer Documentation |
| Documentation | 14_0 Analyst UI | Developer Documentation |
| Documentation | 15_0 Argus Monitor System | Developer Documentation |
| Documentation | 16_0 Argus Feed System | Developer Documentation |
| Documentation | 17_0 Tor Implementation | Developer Documentation |
| Documentation | 18_0 Blacklists and Whitelists | Developer Documentation |
| Documentation | 0_0 Cover Page | Developer Documentation |

| | | |
|---|---|---|
| Documentation | 0_1 OWL Vision Platform and Product Overview | Developer Documentation |
| Documentation | 0_2 Overview of Big Data Storage, MR, and Analytics | Developer Documentation |
| Documentation | 0_4 Data Flow and Interface Summary | Developer Documentation |
| Documentation | 1_0 Job Manager_Poseidon | Developer Documentation |
| Documentation | 2_0 Crawler_Kraken | Developer Documentation |
| Documentation | 2_0_1 Firefox Plugin | Developer Documentation |
| Documentation | 3_0 Cerberus (Deprecated) | Developer Documentation |
| Documentation | 4_0 Kafka_Storm | Developer Documentation |
| Documentation | 5_0 Whois Service | Developer Documentation |
| Documentation | 6_0 MasterLinks | Developer Documentation |
| Documentation | 7_0 Job Tables | Developer Documentation |
| Documentation | 8_0 Scheduler | Developer Documentation |
| Documentation | 9_0 Index_Elasticsearch | Developer Documentation |
| Documentation | 10_0 QueryServices | Developer Documentation |
| Documentation | 11_0 Customer UI | Developer Documentation |
| Documentation | 12_0 OWL Vision Professional Tools | Developer Documentation |
| Documentation | 12_0_1 In-App Help Documentation | Developer Documentation |
| Documentation | 13_0 Admin Portal | Developer Documentation |
| Documentation | 14_0 Analyst UI | Developer Documentation |
| Documentation | 15_0 Argus Monitor System | Developer Documentation |
| Documentation | 16_0 Argus Feed System | Developer Documentation |

| | | |
|---|---|---|
| Documentation | 17_0 Tor Implementation | Developer Documentation |
| Documentation | 18_0 Blacklists and Whitelists | Developer Documentation |
| Documentation | Hackishness Definition | Developer Documentation |
| Documentation | Open Source Dependencies | Developer Documentation |
| Documentation | Guidelines for Using Third Party Code | Developer Documentation |
| Documentation | OWL Vision Test Plan - Pods | Testing |
| Documentation | OWL Vision Test Plan - Overall | Testing |
| Documentation | OWL Vision_Key Differentiators | Marketing |
| Documentation | OWL Vision Roadmap Narrative (Old) | Marketing |
| Documentation | OWL Vision Product and Platform | Marketing |
| Documentation | OWL Vision Metrics | Marketing |
| Documentation | OWL Vision Architecture Diagram | Marketing |
| Website Content | OWL Messaging 2014 Sept | Marketing |
| Website Content | OWL Messaging 2015 March | Marketing |
| Marketing | Pricing Worksheet | Marketing |
| Marketing | RFC Pricing Proposal for Monitors and Alerts | Marketing |
| Website Content | Password Blog (OWL Vision) | Marketing |
| Documentation | OWL Vision 2yr Roadmap (In Progress) | Planning |
| Documentation | OWL Vision 2yr Roadmap Narrative (In Progress) | Planning |
| Documentation | 2015 OWL Vision Roadmap | Planning |
| Documentation | 2015 OWL Vision Roadmap Summary | Planning |

| | | |
|---|---|---|
| Documentation | 2015 OWL Vision Analytics Roadmap Narrative | Planning |
| Documentation | Requirements for Collection 2.0 (Draft) | Planning |
| Documentation | Requirements for Pro Tools January 2015 MVP | Planning |
| Documentation | Requirements for Pro Tools Metadata Fields | Planning |
| Documentation | Requirements for Free Trial Metadata Fields | Planning |
| Documentation | MVP List for Alerts and Search Pods | Planning |
| Documentation | Info Gathering for System Messaging | Planning |
| Documentation | Info Gathering for Historical Search | Planning |
| Documentation | Info Gathering for Free Trial | Planning |
| Documentation | Info Gathering for eCommerce | Planning |
| Documentation | Tasks for Alerts Modules | Planning |
| Documentation | Info Gathering for Alerts Module | Planning |
| Documentation | Info Gathering for Fast Path to Elasticsearch | Planning |
| Documentation | Info Gathering for Combining Kraken Cerberus | Planning |
| Documentation | Release 3 Task List | Planning |
| Documentation | Release 3 Task List | Planning |
| Documentation | Release 3 DeepNet Hunter Feature Map | Planning |
| Documentation | Info Gathering for Release 3 | Planning |
| Documentation | Requirements for Release 2 | Planning |
| Documentation | Release 2 Development Plan | Planning |
| Documentation | Release 2 Architecture Diagram | Planning |

| | | |
|---|---|---|
| Documentation | OWL Vision High Level Architecture | Planning |
| Documentation | Release 2 Summary | Planning |
| Documentation | Release 2 Task List | Planning |
| Documentation | 2015 Budget and Capacity Planning | Planning |
| Documentation | Info Gathering for Threat Actor Database | Planning |
| Documentation | Info Gathering for Raw Pod | Planning |
| Documentation | Threat Actor Database Data Linking Workshop | Planning |
| Documentation | RFC Feed Proposal | Planning |
| Versions | v3.13.0: Fri Dec 19 10:43:18 2014 -0700 | Customer UI Releases |
| Versions | v1.0.0: Fri Jan 9 10:53:29 2015 -0700 | Customer UI Releases |
| Versions | v1.1.0: Wed Jan 21 11:52:42 2015 -0700 | Customer UI Releases |
| Versions | v1.2.0: Wed Feb 4 10:47:45 2015 -0700 | Customer UI Releases |
| Versions | v1.3.0: Wed Feb 18 09:41:39 2015 -0700 | Customer UI Releases |
| Versions | v1.4.0: Tue Feb 24 14:58:35 2015 -0700 | Customer UI Releases |
| Versions | v1.5.0: Wed Mar 18 09:41:15 2015 -0600 | Customer UI Releases |
| Versions | v1.6.0: Wed Mar 25 10:20:47 2015 -0600 | Customer UI Releases |
| Versions | v1.6.1: Wed Mar 25 16:42:56 2015 -0600 | Customer UI Releases |
| Versions | v1.7.0: Mon Apr 20 16:40:50 2015 -0600 | Customer UI Releases |
| Versions | v1.8.0: Tue Apr 28 08:56:39 2015 -0600 | Customer UI Releases |
| Versions | v1.9.0: Tue Jul 14 13:31:51 2015 -0700 | Customer UI Releases |
| Versions | v1.9.1: Tue Jul 14 16:23:06 2015 -0700 | Customer UI Releases |
| Versions | v1.9.2: Tue Jul 14 16:33:50 2015 -0700 | Customer UI Releases |
| Versions | v1.9.3: Mon Aug 24 13:47:56 2015 -0700 | Customer UI Releases |
| Versions | v1.10-SNAPSHOT | Customer UI Releases |
| Versions | v3.0.1 May 7 2014 | Engine Releases |
| Versions | v3.0.2 May 22 2014 | Engine Releases |
| Versions | v3.0.3 June 4 2014 | Engine Releases |
| Versions | v3.0.4 June 19 2014 | Engine Releases |
| Versions | v3.1.0 July 1 2014 | Engine Releases |
| Versions | v3.1.1 July 8 2014 | Engine Releases |
| Versions | v3.3.0 August 5 2014 | Engine Releases |
| Versions | v3.4.0 August 25 2014 | Engine Releases |
| Versions | v3.5.0 September 2 2014 | Engine Releases |
| Versions | v3.6.0 September 17 2014 | Engine Releases |

| | | |
|---|---|---|
| Versions | v3.7.0 September 30 2014 | Engine Releases |
| Versions | v3.8.0 October 13 2014 | Engine Releases |
| Versions | v3.9.0 October 27 2014 | Engine Releases |
| Versions | v3.10.0 November 10 2014 | Engine Releases |
| Versions | v3.11.0 November 24 2014 | Engine Releases |
| Versions | v3.12.0 December 9 2014 | Engine Releases |
| Versions | v3.13.0 December 22 2014 | Engine Releases |
| Versions | v3.14.0 January 12 2015 | Engine Releases |
| Versions | v3.15.0 February 2 2015 | Engine Releases |
| Versions | v3.16.0 February 17 2015 | Engine Releases |
| Versions | v3.17.0 March 9 2015 | Engine Releases |
| Versions | v3.18.0 March 17 2015 | Engine Releases |
| Versions | v3.19.0 April 5 2015 | Engine Releases |
| Versions | v3.20.0 April 13 2015 | Engine Releases |
| Versions | v3.21.0 April 27 2015 | Engine Releases |
| Versions | v3.22.0 May 11 2015 | Engine Releases |
| Versions | v3.23.0 June 2 2015 | Engine Releases |
| Versions | v3.24.0 June 8 2015 | Engine Releases |
| Versions | v3.25.0 August 24 2014 | Engine Releases |
| Versions | 3.26-SNAPSHOT | Engine Releases |
| Training | Help Video - Script - Search Pods and Building a Query | Help Video |
| | | |
| Training | Help Video - Script - Overview | Help Video |
| Training | Help Video - Script - Introduction | Help Video |
| Training | Help Video - Script - Filters and Fields Search Pods | Help Video |
| | | |
| Training | Introduction to OWL Vision Professional Tools | Help Video |

**EXHIBIT B**

**LIST OF TANGIBLE PERSONAL PROPERTY**

| Asset Type | Device Details | Model Number | Part Number | Serial Number |
|---|---|---|---|---|
| Laptop | ThinkPad T510 | 4384-AJ9 | 4384AJ9 | SA-R9C2MKK |
| Laptop | ThinkPad X230 | 2320-HQU | 2320HQU | PK-2DF6D |
| Laptop | MacBook Pro 15.4 | A1398 | ME293LL/A | C02LM5N5FD56 |
| Laptop | ThinkPad T510 | 4314-DEU | 4310DEU | R9-EGMB3 |
| Laptop | ThinkPad T510 | | | R9-8NDR5 |
| Laptop | ThinkPad T510 | 4314-DEU | 4314DEU | R9-EGMA7 |
| Laptop | ThinkPad T510 | 4314-DEU | 4310DEU | R9-EGMAX |
| Laptop | ThinkPad T520 | | | R9-RYH7Z |
| Laptop | ThinkPad T540p | 20BE-0085US | 20BE0085US | R9-0FD678 |
| Laptop | ThinkPad W520 | 4270-CTO | 4270CTO | R9-DATZH |
| Laptop | ThinkPad X230 | 2306-CTO | 2306CTO | PK-2A6ZK |
| Laptop | ThinkPad X230 | 2306-CTO | 2306CTO | PK-20V57 |
| Laptop | ThinkPad T510 | 4314-DEU | 4310DEU | R9-EGMBD |
| Laptop | MacBook Pro 15.4 | A1398 | ME294LL/A | C02LKV78FD57 |
| Laptop | MacBook Pro 15.4 | A1398 | ME294LL/A | C02LM10GFD57 |
| Laptop | MacBook Pro 13.3 | A1502 | MGX82LL/A | C02NTVTMG3QJ |
| Laptop | MacBook Pro 15.4 | A1398 | ME294LL/A | C02LKQ7HFD57 |
| Laptop | ThinkPad L540 | 20AV-CT01WW | 20AVCT01WW | R9-003H9E |
| Laptop | ThinkPad L540 | 20AV-CT01WW | 20AVCT01WW | R9-022R82 |
| Laptop | ThinkPad S3-S431 | 20AX-CTO1WW | 20AXCTO1WW | MP-04WFWP |
| Laptop | ThinkPad S431 | 20AX-CTO1WW | 20AXCTO1WW | MP-04LMDY |
| Laptop | ThinkPad T510 | | | R8-04L7FV |
| Laptop | ThinkPad T530 | 2953-CTR | 2953-CTR | R9-W5920 |
| Laptop | ThinkPad W540 | | | |
| Laptop | ThinkPad 520 | | | |
| Laptop | ThinkPad 520 | | | |
| Laptop | ACER | BL51 | Aspire 5100 | |
| Laptop | HP | | Parts computer | |
| Laptop | MacBook Pro 15.4 | A1398 | Z0PU00027 | C02LM82AFD59 |
| Laptop | MacBook Pro 15.4 | A1398 | MGXG2LL/A | C02P70QKG3QG |

| Asset Type | Device Details | Model Number | Part Number | Serial Number | Software Licenses Used |
|---|---|---|---|---|---|
| Desktop | Gateway Desktop | Gateway DX4300 | 92103452127 | PTG830X003921086D92700 | Win 7 Pro, Office 2013 |
| Desktop | Custom | Asset-1000 | Asset-1000 | OWL-HVX88763 | Win 8 - downgrade, Office 2013 |
| Desktop | Custom | Asset-1001 | Asset-1001 | OWL-YTE26349 | |
| Desktop | HP Desktop | Eilite Desk 800 G1 TWR | E1Z94UT#ABA | 2UA33721GC | Office 2013 |
| Desktop | Custom | Asset-1002 | Asset-1002 | OWL-RUE38725 | Office 2013 |
| Desktop | HP Desktop | HP EliteDesk 800 G1 | 11158427 | MXL40827R9 | 4/10/2014 |

| Asset Type | Device Details | Model Number | Serial Number |
|---|---|---|---|
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133602209 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301334 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301336 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301338 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301343 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301344 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301346 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301347 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133301349 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133910690 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133910691 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133910687 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST133910684 |
| Monitor | Viewsonic 24" LED | VG2439M-LED | T7E140781358 |
| Monitor | Viewsonic 24" LED | VG2439M-LED | T7E140781364 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST140941814 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST140941810 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST140941802 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST141741825 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST141741836 |
| Monitor | Viewsonic 24" LED | VA2446M-LED | TST150620836 |
| Monitor | Viewsonic 24" LED | VG2439M-LED | T7E144862403 |

| Asset Type | Status | Device Details | Model Number | Serial Number |
|---|---|---|---|---|
| Switch | In-Service | Cisco SB SG500 | SG500-52 | DNI174101CN |
| Switch | In-Service | Cisco SB SG200 | SG200-50 | DN174206RN |
| Firewall | In-Service | Cisco ASA | ASA 5515-X | unknown |
| Switch | In-Service | Cisco SB SG500X | SG500X-24 | DNI1811028P |

| Asset Type | Status | Device Details | Model Number | Part Number | Serial Number |
|---|---|---|---|---|---|
| Server | In-Service | Rackform iServ | R346.v4 | SM83382 | C8250FC39M60355 |
| Server | In-Service | Rackform iServ | R346.v4 | SM83381 | C8250FC39M60362 |
| Server | In-Service | Unitrends | Recovery-713 | RC713 | 713-101-50373 |
| Server | In-Service | QNAP | TS-EC879U-RP-US | PK7875 | Q13AI06645 |
| Server | In-Service | Symantec | SMG8340 | 21290515 | 9PNYDZ1 |
| Server | In-Service | HP | Proliant DL360 G7 | | MXQ1500KWL |

| Asset Type | Status | Device Details | Model Number | Serial Number |
|---|---|---|---|---|
| Printer | In-Service | HP | Color LaserJet 3600 | unknown |
| Printer | In-Service | HP | Color LaserJet 2600 | unknown |
| Combo Printer/Scanner/Copier | In-Service | Canon | MX350 Series | unknown |

| Asset Type | Status | Device Details | Model Number | Part Number | Serial Number |
|---|---|---|---|---|---|
| UPS | In-Service | APC SMT2200RM2U | SMT2200RM2U | | AS1339147871 |
| UPS | In-Service | SC450RM1U | SC450RM1U | | S5S1334T07502 |
| UPS | In-Service | SC450RM1U | SC450RM1U | | S5S1341T11133 |
| Assorted Cabling | n/a | n/a | n/a | | n/a |
| Assorted Power Cords | n/a | n/a | n/a | | n/a |
| Paper Shredder | In-Service | GoECOLife | | | |
| Paper Shredder | In-Service | GoECOLife | | | |
| Paper Shredder | In-Service | Staples | | | |

| HOSTNAME | OS Version | MAKE | MODEL | SERIAL NUMBER | WARR EXP | CPU | CPU Core Count | RAM (GB) | STORAGE (GB) |
|---|---|---|---|---|---|---|---|---|---|
| Datanode01.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM85264 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 128 | 2x250gb;12x3tb |
| Datanode02.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM85262 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 128 | 2x250gb;12x3tb |
| Datanode03.prod | CentOS 6.7 | unknown | unknown | unknown | unknown | Intel Xeon CPU E5-2620 @ 2.0GHz | 2x 6-core HT | 128 | 2x250gb;12x3tb |
| Datanode04.prod | CentOS 6.7 | Silicon Mechanics | iServ R133.v5.1 | unknown | 8/1/2018 | Intel Xeon E3-1220v3, 3.1GHz | 1x 4-core | 32 | 3 x 3tb |
| Datanode05.prod | CentOS 6.7 | Silicon Mechanics | iServ R133.v5.1 | unknown | 8/1/2018 | Intel Xeon E3-1220v3, 3.1GHz | 1x 4-core | 32 | 4 x 3tb |
| Feeder01.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85237 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| Feeder02.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85238 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| hub01.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85243 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| hub02.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85239 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| index01-hist.prod | CentOS 6.7 | Silicon Mechanics | iServ R309.v4 | SM92981 | 12/4/2017 | Intel Xeon E5-2407V2 @ 2.4 GHz | 2x 4-core | 48 | 6x480gb; 2x80gb SSD |
| index01.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM85266 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 64 | 2x250gb;12x480 gb SSD |
| index02-hist.prod | CentOS 6.7 | Silicon Mechanics | iServ R309.v4 | SM92982 | 12/4/2017 | Intel Xeon E5-2407V2 @ 2.4 GHz | 2x 4-core | 48 | 6x480gb; 2x80gb SSD |
| index02.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM85265 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 64 | 2x250gb;12x480 gb SSD |
| index03.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM88168 | 8/1/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 64 | 2x250gb;12x480 gb SSD |
| index04.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM88169 | 8/1/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 64 | 2x250gb;12x480 gb SSD |
| index05.prod | CentOS 6.7 | Silicon Mechanics | unknown | unknown | unknown | Intel Xeon CPU E5-2620 @ 2.4GHz | 2x 6-core HT | 64 | 2x250gb;12x480 gb SSD |
| index06.prod | CentOS 6.7 | Silicon Mechanics | R513.v5 | SM94566 | 3/26/2018 | Intel® Xeon® E5-262v3, 2.4GHz | 2x 6-core HT | 64 | 2x240gb;12x480 gb SSD |
| journalnode.prod | CentOS 6.7 | Silicon Mechanics | iServ R513.v4 | SM85263 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 128 | 2x250gb;12x3tb |
| namenode01.prod | CentOS 6.7 | Silicon Mechanics | iServ R346.v4 | SM85327 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 128 | 2x250gb;8x3tb |
| namenode02.prod | CentOS 6.7 | Silicon Mechanics | iServ R346.v4 | SM85328 | 3/20/2017 | Intel(R) Xeon(R) CPU E5-2620 V2 @ 2.1GHz | 2x 6-core HT | 128 | 2x250gb;8x3tb |
| parser01.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85242 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| parser02.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85240 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| tor01.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85246 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| tor02.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85245 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| tor03.prod | CentOS 6.7 | Silicon Mechanics | | | | Intel Xeon CPU E3-1220 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| web01.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85241 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |
| web02.prod | CentOS 6.7 | Silicon Mechanics | iServ R101.v5 | SM85244 | 3/20/2017 | Intel(R) Xeon(R) CPU E3-1220 V2 @ 3.10GHz | 1x 4-core | 32 | 2x500gb |

Furniture and Misc. Equipment

All tables, chairs, file cabinets, device stands and desks used at 2505 W 2nd Ave including, but not limited to:

- All kitchen tables and chairs

- The large Boardroom table

- All patch panels and cabling

- All equipment racks in data / phone area

- All back up power equipment including generators, UPS, and transfer switches

DC Development Rack

| HOSTNAME | OS Version | Make | Model | Serial Num | Warr Exp | CPU | CPU Core Count | RAM (GB) | Storage (GB) |
|---|---|---|---|---|---|---|---|---|---|
| cie01.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM75554 | 4/2/2016 | Intel Xeon CPU E5-2420 0 @ 1.90Ghz | 2x 6-core HT | 96GB | 2x1tb |
| cie02.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM75555 | 4/2/2016 | Intel Xeon CPU E5-2420 0 @ 1.90Ghz | 2x 6-core HT | 96GB | 2x3tb |
| cludn02.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM75939 | 4/2/2016 | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| cludn03.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM74043 | 4/2/2016 | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| cludn04.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM74040 | 4/2/2016 | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| cludn05.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM74042 | 4/2/2016 | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| cludn06.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | unknown | unknown | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| clunn01.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM72392 | 4/2/2016 | Intel Xeon CPU E5-2650 0 @2.00Ghz | 2x 8-core HT | 128GB | 2x1tb; 6x3tb |
| clunn02.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM72880 | 4/2/2016 | Intel Xeon CPU E5-2650 0 @2.00Ghz | 2x 8-core HT | 128GB | 8x3tb;1x320gb |
| search01.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | unknown | unknown | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| search02.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | unknown | unknown | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| clusup01.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM73938 | 4/2/2016 | Intel Xeon CPU E3-1230 V2 @3.30Ghz | 1x 4-core HT | 32GB | 4x3tb |
| clusup02.engine.local | CentOS 6.7 | Silicon Mechanics | iServ | SM74041 | 4/2/2016 | Intel Xeon CPU E5504 @ 2.00Ghz | 1x 4-core HT | 24GB | 1x1tb |

## EXHIBIT C

## LIST OF BOOKS, RECORDS AND THIRD-PARTY SOFTWARE

1. All customer lists and vendor lists, with corresponding contact information for each

2. Development team software, including but not limited to:

| Application | Use | Status | Cost | Terms Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Java 7 | Code | Free | NA | http://www.oracle.com/technetwork/java/javase/terms/bcljavaredme/java-license-366168.html/ | | | | | |
| Gradle | Hardware Reporting | Open Source | NA | BSD License - https://en.wikipedia.org/wiki/BSD_licenses | | | | | |
| MediaWiki | Developer Wiki | Open Source | NA | https://www.mediawiki.org/wiki/MediaWiki:License | | | | | |
| Nagios | Alerting | Open Source | NA | https://assets.nagios.com/licenses/nagios_open_software_license.txt | | | | | |
| ReviewBoard | Code Review | Open Source | NA | MIT License - http://opensource.org/licenses/MIT | | | | | |
| Subversion | SVN Document Control | Open Source | NA | Apache License Version 2.0 - http://www.apache.org/licenses/LICENSE-2.0 | | | | | |
| TortoiseSVN | SVN Document Publishing/Updating | Open Source | NA | GNU General Public License | | | | | |
| Maven | Software Build Tool | Open Source | NA | Apache License Version 2.0 - http://www.apache.org/licenses/LICENSE-2.0 | | | | | |
| Jenkins | Continuous Integration Tool | Open Source | NA | MIT License - http://opensource.org/licenses/MIT | | | | | |
| IntelliJ IDEA Community Edition | Java Development IDE | Open Source | NA | Apache License Version 2.0 - http://www.apache.org/licenses/LICENSE-2.0 | | | | | |
| Eclipse | IDE | Open Source | NA | https://en.wikipedia.org/wiki/Eclipse_Public_License | | | | | |
| Vi | Text Editor | Open Source | NA | BSD License - https://en.wikipedia.org/wiki/BSD_licenses | | | | | |
| Grunt | Build Web Projects | Open Source | NA | MIT License - http://opensource.org/licenses/MIT | | | | | |
| Ansible | Build Automation | Open Source | NA | GNU General Public License | | | | | |
| VirtualBox | VM | Open Source | NA | GNU General Public License | | | | | |
| Chrome | Web Development (Included for com | Open Source | NA | Creative Commons Attribution 2.5 license - http://creativecommons.org/licenses/by/2.5/; BSD License - https://en.wikipedia.org/wiki/BSD_licenses | | | | | |
| Firefox | Web Development (Included for com | Open Source | NA | Mozilla Public License - https://www.mozilla.org/MPL/ | | | | | |
| MySQL Workbench Community | Database | Open Source | NA | GNU General Public License | | | | | |
| MS Office Standard | Word Processing, Spreadsheets | Paid - One Time | Licenses purchased for entire company — can get info if required | | | | | | |
| OmniGraffle | Wireframe Tool | Paid - One Time | $200 for 2 license | http://www.omnigroup.com/omnigraffle | | | | | |
| Sublime Text | Text Editor | Paid - One Time | Purchased pre-2014, we have li | http://www.sublimetext.com/sub | | | | | |
| VMware Fusion 7 Pro Edison | VM | Paid - One Time | $134 for 1 license | http://www.vmware.com/download/eula/universal_eula.html | | | | | |
| Sketch | Visual Design Tool | Paid - One Time | $178 for 2 licenses | http://bohemiancoding.com/sketch/ | | | | | |
| Webstorm (IntelliJ) | Web Development | Paid - One Time | $100 for 1 license | https://www.jetbrains.com/company/contacts/purchase_terms.html | | | | | |
| Pixave | Visual Design Tool | Paid - One Time | $278 for 2 licenses | https://secure.maxxer.co/code/UHC | | | | | |
| MS Project | Project Management Software | Paid - One Time | $611 for 1 license | | | | | | |
| Flycuto | Prototyping Tool | Paid - One Time | $200 for 2 license | **Google recently purchased Flycuto and terms/pricing seem to be changing | | | | | |
| JIRA | Tasking, Tracking, and Bugs | Paid - One Time | $30 for 10 users | https://www.atlassian.com/end-user-agreement/ | | | | | |

3. Services software, including but not limited to:

| Software | Department | Details |
|---|---|---|
| Burp | Red Team | |
| Maltego | Analyst Team | Variable renewals. Purchased on new employee start date. Initial cost = $750. Renewal cost = $320 |
| Milestone XProtect | Red Team | |
| Nessus | Red Team | 12 month subscription |
| Thomson Reuters CLEAR | Analyst Team | 12 month subscription |
| CheckMarx | Red Team | 12 month subscription |

4. Company software, including but not limited to:

| Software | Expiration Date | Cost | Department | Details |
|---|---|---|---|---|
| Adobe Creative Cloud | Monthly | $80 | Company | Dev team uses for designs, UX, UI development. Company uses for marketing slicks, etc. |
| FideAS | 12/31/2014 | $1,382 | Company | Company encryption |
| Symantec Endpoint Protection | 11/20/2014 | $1,186 | Company | Company email |
| Symantec Message Gateway | 4/17/2015 | $983 | Company | Company email |
| Unitrends | 3/1/2015 | $1,599 | Company | Expecting a $595 discount for overpaid services |
| OpenVPN Access Server | 11/14/2015 | $96 | Company | Company network |

**EXHIBIT D**

**LIST OF INTANGIBLE PROPERTY**

1. The Assignment of Rights Agreement dated as of June 19, 2012 between Chris Roberts and Seller, including all IP assigned to Seller thereunder.

2. The right to enforce confidentiality and non-competition provisions contained in the Roberts Employment Agreement, dated April 14, 2014.

3. All Proprietary Rights and Non-Disclosure Agreements entered into between Seller and each of its current or former employees, including the non-solicitation and/or non-compete agreements contained therein.

4. Other Company Intangibles, including but not limited to:

| Company Subscriptions, Maintenance, and Licenses | | | | |
|---|---|---|---|---|
| Internet Services/VOIP/Other | Expiration Date | Cost | Department | Details |
| Fortrust Data Center | Monthly | ~$5000 | Dev Team | Variable based on actual bandwidth usage -- typically $5000-7000/month. |
| AWS | Monthly | ~$105 | Dev Team | Hosting for OWL Vision mirror. Variable based on actual traffic usage. Typically $95-$115/month. |
| SSL Certifications | Biannual | $100 | Dev Team | 2x per year |

**EXHIBIT E**

**EXCLUDED ASSETS**

1.  Accounts and cash deposits;

2.  Executory contracts and unexpired personal property leases not otherwise assumed by Buyer;

3.  All causes of action and rights of recovery for avoidance actions of Seller, including but not limited to, those under 11 U.S.C. §§ 547 through 553;

4.  Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof;

5.  All insurance proceeds, claims and causes of action with respect to or arising in connection with (a) any Rejected Contract which is not assigned to Buyer at the Closing, or (b) any item of tangible or intangible property not acquired by Buyer at the Closing; provided however, that no recovery arising pursuant to (a) or (b) shall be payable to Seller until proceeds payable to Buyer, if any, have been first satisfied. For the avoidance of doubt, Buyer shall have the right to receive any insurance proceeds arising out of the Purchased Assets, and Buyer's rights shall be entitled to priority over any competing or overlapping rights of Seller;

6.  Any refunds from tax authorities with regards to tax periods prior to the Closing Date;

7.  All of Seller's organizational documents and corporate books and records including, without limitation, Seller's minutes books and stock ledger;

8.  All of Seller's insurance policies, whether policies relating to property, liability, business interruption, health and workers' compensation, and lives or health (disability coverage) of officers of Sellers;

9.  Any pension, profit sharing or savings plans and trusts, and the assets thereof;

10. Shares of capital stock of Seller held in its treasury;

11. Professional fee retainers, including without limitation, those held by Bieging, Shapiro & Barber LLP;

12. Any causes of action and claims of Seller arising out of or relating to transactions that took place or were scheduled to take place prior to the Closing Date;

13. Any bids and deposits received from any person other than Buyer or its agents or representatives in connection with the proposed sale of any of the Purchased Assets, and any analyses prepared by or on behalf of Sellers of any bids for the Purchased Assets or any portion thereof, or any materials relating to the negotiations with any potential bidder;

14. All personnel records and other records which Seller are required by law to retain in its possession; and

15. Any and all prepaid expenses relating to these Excluded Assets.

## EXHIBIT F

## BILL OF SALE

Pursuant to Section 1.1.1, 1.1.2, 1.1.3, 1.1.4 and 1.1.5 of that certain Asset Purchase Agreement dated as of October 21, 2015 (the "**Purchase Agreement**"), by and between **ONE WORLD LABS, INC.**, a Colorado corporation ("**Seller**"), and **MNR Labs, LLC**, a Colorado limited liability company (the "**Buyer**"), and for good and valuable consideration, the receipt and sufficiency of which Seller hereby expressly acknowledges, to the extent of its interests therein, Seller hereby sells, transfers, assigns and delivers all of its right, title and interest in and to the Purchased Assets.

Capitalized terms used herein and not expressly defined shall have the meaning ascribed such terms in the Purchase Agreement.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement). In the event of any inconsistencies between the terms of this Bill of Sale and those of the Purchase Agreement, the terms of the Purchase Agreement shall be controlling.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed as of the [_____] day of _____, 2015.

**ONE WORLD LABS, INC.,** a Colorado corporation

By: _____

    Name:

    Its:

## EXHIBIT G

## ASSIGNMENT OF INTELLECTUAL AND INTANGIBLE PROPERTY

**ONE WORLD LABS, INC., a Colorado corporation** ("Seller") (the "**Assignor**") executes this Assignment of Intellectual Property and Intangible Property (the "**Assignment**") in favor of **MNR Labs, LLC,** a Colorado limited liability company (the "**Assignee**"), with respect to the following facts and circumstances:

(A)    Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated as of October 21, 2015, (the "**Purchase Agreement**") by and between Seller and Assignee.  Capitalized terms used herein and not expressly defined shall have the meaning ascribed to such terms in the Purchase Agreement.

(B)    Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement.  Pursuant to Sections 4.3.2 and 4.4.2 of the Purchase Agreement, Assignor and Assignee are required to mutually execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignor hereby expressly acknowledges, Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of Assignor's right, title and interest, if any, in and to all Intellectual Property and Intangible Property, including, but not limited to, its right, title and interest, if any, in and to the Intellectual Property and Intangible Property identified on **Schedule 1** attached hereto and incorporated herein by this reference. This Assignment shall inure to the benefit of, and be binding upon, the successors, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement).  In the event of any inconsistencies between the terms of this Assignment and those of the Purchase Agreement, the terms of the Purchase Agreement shall be controlling.

In the event that Assignor or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Colorado, without giving effect to any choice of law or conflict of law provision which would cause the application of the laws of any jurisdiction other than those of the State of Colorado.

**Bankruptcy Court Jurisdiction.  ASSIGNOR AND ASSIGNEE AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER**

**ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS ASSIGNMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (II) THE INTELLECTUAL PROPERTY AND INTANGIBLE PROPERTY AND ASSIGNEE EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

**IN WITNESS WHEREOF**, Assignor has executed this Assignment of Intangible Property as of the [___] of _____, 2015.

**ASSIGNOR:**

**ONE WORLD LABS, INC.,** a Colorado corporation

By: _____
     Name:
       Its:

**ASSIGNEE:**

**MNR Labs, LLC,** a Colorado limited liability company

By:_____
     Name: _____
     Its:  Manager

*[Notary acknowledgement forms on the following pages]*

STATE OF COLORADO            )
                            ) ss.
COUNTY OF_____)

     The foregoing instrument was acknowledged before me this ___ day of _____
_____, 2015, by _____ as _____ of One World Labs,
Inc., a Colorado corporation.

Witness my hand and official seal.


_____
Notary Public


STATE OF COLORADO            )
                            )ss.
COUNTY OF_____)

     The foregoing instrument was acknowledged before me this ____ day of _____,
2015, by _____ as Manager of MNR Labs, LLC, a Colorado limited liability company.

Witness my hand and official seal.


_____
Notary Public

**EXHIBIT H**

**ASSUMED CONTRACTS AND CURE AMOUNTS**

| Creditor Name | Creditor Address | Registered Agent | Agreement | Cure Amount |
|---|---|---|---|---|
| ADP, Inc. | 1 ADP Blvd<br>Roseland, NJ 07068 | The Corporation Company<br>1675 Broadway, Suite 1200<br>Denver, CO 80202 | Payroll Service<br>Client ID 2219685 | $0.00 |
| BancFirst | c/o Patrick McKenna<br>3509 South Purdue Street<br>Oklahoma City, OK 73179 | | OWL Vision | $0.00 |
| Bioventus LLC | 1900 Charles Bryan Road,<br>Suite 275<br>Cordova, TN 38016 | The Corporation Company<br>1675 Broadway, Suite 1200<br>Denver, CO 80202 | OWL Vision | $0.00 |
| Blue Ocean | 416 West Oak Street<br>Fort Collins, CO 80521 | Kevin M. Sullivan<br>401 West Mountain<br>Avenue, Suite 200<br>Fort Collins, CO 80521 | OWL Vision | $0.00 |
| Blue Ocean | 416 West Oak Street<br>Fort Collins, CO 80521 | Kevin M. Sullivan<br>401 West Mountain<br>Avenue, Suite 200<br>Fort Collins, CO 80521 | Customer Contract<br>Risk Analysis<br>original contract dated 9/6/13 | $0.00 |
| Checkmarx | Accounts Receivable<br>5250 Old Orchard Road<br>Skokie, IL 60077 | Incorporating Services, Ltd.<br>95 Emerson Street, Suite<br>601<br>Denver, CO 80218 | | $10,000.00 |
| Comcast | PO Box 34733<br>Seattle, WA 98124-1744 | The Corporation Company<br>1675 Broadway, Suite 1200<br>Denver, CO 80202 | Internet Service<br>Acct No. 8641<br>Acct No. 5055 | $850.00 |
| Comcast | PO Box 34733<br>Seattle, WA 98124-1744 | The Corporation Company<br>1675 Broadway, Suite 1200<br>Denver, CO 80202 | Internet Service<br>Acct No. 8641<br>Acct No. 5055 | $530.00 |
| Donald McLaughlin | 2585 South Jebel Way<br>Aurora, CO 80013 | | Risk Analysis<br>Contractor for Hire | $0.00 |

| Creditor Name | Creditor Address | Registered Agent | Agreement | Cure Amount |
|---|---|---|---|---|
| FEDEX | 80 Fedex Parkway 1st Floor Vert Collierville, TN 38017 | The Corporation Company 1675 Broadway, Suite 1200 Denver, CO 80202 | OWL Vision | $0.00 |
| First Data Merchant Service | 1307 Walt Whitman RoadMelvill, NY 11747 | Corporation Service Company1560 Broadway, Suite 2090Denver, CO 80202 | Contract for receipt of customer credit card funds for software and service purchases | $0.00 |
| GM | 400 Renaissance Center Detroit, MI 48265 | The Corporation Company 1675 Broadway, Suite 1200 Denver, CO 80202 | Other Security Services | $0.00 |
| Great West | 8515 East Orchard Road, 2NB Greenwood Village, CO 80111 | Division of Insurance 1560 Broadway, Suite 110 Denver, CO 80202 | Rick Analysis | $0.00 |
| Guardian Insurance | PO Box 677458 Dallas, TX 75267-7458 | Division of Insurance 1560 Broadway, Suite 110 Denver, CO 80202 | Dental and Vision Insurance | $0.00 |
| Holcim | 6211 Ann Arbor Road Dundee, MI 48131 | The Corporation Company 1675 Broadway, Suite 1200 Denver, CO 80202 | OWL Vision | $0.00 |
| Humana | 1100 Employers Blvd Green Bay, WI 54344 | Division of Insurance 1560 Broadway, Suite 110 Denver, CO 80202 | Healthcard | $0.00 |
| Hunter Douglas | One Duette Way Broomfield, CO 80020 | Corporation Service Company 1560 Broadway, Suite 2090 Denver, CO 80202 | OWL Vision | $0.00 |
| Hunter Douglas | One Duette Way Broomfield, CO 80020 | Corporation Service Company 1560 Broadway, Suite 2090 Denver, CO 80202 | Risk Analysis | $0.00 |

| Creditor Name | Creditor Address | Registered Agent | Agreement | Cure Amount |
|---|---|---|---|---|
| Infoguard | Attn:  Thomas MeierLindenstrasse 106340 Baar SWITZERLAND | | OWL Vision | $0.00 |
| Jakob Migler | 6159 West 70th Avenue Arvada, CO  80003 | | Data Network Administrator | $0.00 |
| Lincoln Financial Group | 1701 Gold Road Tower 3, 4th Floor Rolling Meadows, IL | | OWL Vision | $0.00 |
| Maxwell Delmonico | 10109 South Woodrose Court Highlands Ranch, CO 80120-9000 | | Network Administration | $0.00 |
| MegaPath | Dept 0324 PO Box 120324 Dallas, TX  75312-0324 | | Phone Service | $2,939.00 |
| Oppenheimer Funds | 6801 South Tucson Way Englewood, CO  80112 | Brian Wixted 6803 South Tucson Way Centennial, CO  80112 | Risk Analysis | $0.00 |
| OtterBox | 209 South Meldrum Street Fort Collins, CO  80521 | Kevin M. Sullivan 401 West Mountain Avenue, Suite 200 Fort Collins, CO  80521 | Risk Analysis | $0.00 |
| OtterBox | 209 South Meldrum Street Fort Collins, CO  80521 | | Other Security Services | $0.00 |
| Seagate | 10200 South DeAnza Blvd Cupertino, CA  95014 | The Corporation Company 1675 Broadway, Suite 1200 Denver, CO  80202 | OWL Vision | $0.00 |
| Sprint 731930311 | PO Box 4181Carol Stream, IL  60197-4181 | Corporation Service Company1560 Broadway, Suite 2090Denver, CO 80202 | Wireless Phone Service | $0.00 |

| Creditor Name | Creditor Address | Registered Agent | Agreement | Cure Amount |
|---|---|---|---|---|
| Thought for Security LLC | 497 West Elizabeth Street<br>Olathe, KS  66061 | Chester Virgil Bishop<br>2666 South Eaton Place<br>Lakewood, CO  80227 | Other Security Services | $0.00 |
| Trilby P | 180 Humboldt Street<br>Denver, CO  80218 | Trilby Properties LLC<br>180 Humboldt Street<br>Denver, CO  80218 | 1099 Contractor for Hire | $0.00 |
| Ubiquity | 101 Green Street, 2nd Floor<br>San Francisco, CA  94111 | | 401k Management Services | $0.00 |
| UPMC | 600 Grant Street<br>US Steel Building, Office 6035<br>Pittsburgh, PA  15219 | | Risk Analysis | $0.00 |
| Zenefits | 303 Second Street<br>North Tower, Suite 401<br>San Francisco, CA  94107 | | Online Payroll and Benefit Management Services | $0.00 |
| **TOTAL** | | | | **$14,319.00** |

#399519